# RUHNKE & BARRETT

## ATTORNEYS AT LAW

47 PARK STREET
MONTCLAIR, N.J. 07042
973-744-1000

2 9 BROADWAY, SUITE 1412
NEW YORK, N.Y.  10006
212-608-7949

973-746-1490 (FAX)

DAVID A. RUHNKE (davidruhnke@ruhnkeandbarrett.com)   ◇   JEAN D. BARRETT (jeanbarrett@ruhnkeandbarrett.com)

REPLY TO MONTCLAIR OFFICE

October 5, 2017

Via ecf
Honorable LaShann DeArcy Hall, U.S.D.J.
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Re:    *United States v. Xavier Oneal*, 16 CR 21 (LDH)

Dear Judge DeArcy Hall:

I represent Xavier Oneal who is scheduled to be sentenced by the Court on October 19, 2017 at 1 pm.  Please accept this letter memorandum in support of a sentence below the guideline range as sufficient punishment for Xavier's crime and for Xavier as a person.

A.    Xavier's background

Xavier Nico O'Neil is 23 years old, 21 at the time of these ofenses.  He was born on July 21, 1994 to the unmarried union of Victoria DiSalvatore and Delroy O'Neil Baronette. At the time of his birth, Xavier was living with his mother and brother, Niles O'Neil who is three years older, at 163-03 89th Avenue in Jamaica, Queens.

The community of Jamaica, Queens more specifically the neighborhood in which Xavier was born and raised for the first few years of his life is one of the busiest in Queens, stretching from the shopping districts of Hollis to the Van Wyck Expressway to the housing

projects of South Jamaica. It is comprised of some of the city's most ethnically diverse neighborhoods, with new immigrants from countries including Jamaica – like Xavier's father - mixing with the predominantly black long-term residents in middle- and lower-income neighborhoods of mostly one- and two-family homes.  At once a commuting hub and an extremity of New York City, the neighborhood, particularly the neighborhood of South Jamaica, became a national symbol of the war on drugs on Feb. 26, 1988 when Officer Edward Byrne, 22, was shot in the head while he sat in a patrol car. Four men were tried and convicted of carrying out the murder of Officer Byrne and received sentences of 25 years to life. A drug gang leader, Howard Mason, was convicted of racketeering charges that included ordering the murder of Officer Byrne and was sentenced to life in prison.

The killing, which Mayor Edward I. Koch declared an "attack on society," became a catalyst for some of New York's most wide-ranging crackdowns on crime, including special narcotics units that made broad sweeps of areas of South Jamaica that had long been terrorized by drug gangs. The results of the crackdown were mixed. There were thousands of arrests and fewer shootings over turf as drug organizations were dismantled, but some of the drug trade was pushed to other neighborhoods or indoors. Homicides in the precinct rose from the 30 homicides in 1988, the year Officer Byrne was murdered to 51 in 1991, the year Xavier's brother Niles was born, the highest in Queens.[1]  Murder rates rose citywide in 1999, when Xavier was five years old, but the increase was greatest in Queens South precincts –

---

[1] http://www.nytimes.com/2008/02/24/nyregion/24precinct.html

Jamaica's 103rd precinct included - where there was a 40 percent rise in homicides last year, according to the Police Department.[2]

*Early Childhood Development*

By all accounts, Xavier was born into an unstable and dysfunctional household. According to Yvonne Richards, Xavier's "godmother" and sometime caregiver, she met Xavier and his mother shortly after Xavier was born. Ms. Richards was a well-known neighborhood babysitter. She had two biological children, was appointed legal guardian for four others and "adopted" close to twenty children from the neighborhood whose parents were unable to care for them. Xavier and his brother Niles were two of those twenty children.

According to Ms. Richards, Xavier's mother first asked her to care for Xavier when he was six months old. Ms. Richards reported that Xavier was born prematurely and was severely underweight as an infant. He didn't learn to walk until after he was a year old and did not start talking until he was around two. Ms. Richards always suspected that Xavier was exposed to drugs *in utero* and was possibly born addicted, based on what she observed of his mother's chronic drug use and neglect. There were times when Xavier's mother would drop him off and not return for days.

From birth until age about age four or five, Xavier and his brother were in their mother's care bouncing between various caregivers and family members. Xavier's paternal grandmother, Patsy Baronette, reportedly worked for the Administration for Children's

---

[2] http://www.timesledger.com/stories/2000/6/20000210-archive59.html

Services, and was therefore able to shelter Xavier's parents from formal investigations of neglect and abuse. But neglect occurred nonetheless. Xavier's brother remembers that she would leave them alone for days on end while she worked in a strip club and as a prostitute. When asked by mitigation specialist, Beth Cahill, [3] how he as a child knew she was engaged in prostitution, Niles vividly recalled times when his mother would get into arguments with random men for money and a man screaming at her, "At least I don't have to suck dick for rent, bitch."

When Xavier was four or five, Ms. Richards finally decided to take Xavier and his brother to live with her and her husband. She was tired of visiting their apartment and seeing their mother strung out and unable to care for them. As Xavier began school, Ms. Richards noticed he was "very slow" compared to his school age peers. She started taking him to speech therapy, but stopped short of formally requesting an evaluation from the school district because Xavier's custody with her was an informal arrangement unsanctioned by Family Court.  In hindsight, Ms. Richards blames herself for not seeking full custody, because if she had, Xavier could have received the appropriate services.

According to Ms. Richards, Xavier started having trouble in school at an early age. He would act out in class and disturb other children. He had difficulty sitting still for long periods of time and was described as extremely "hyper." At home she found him more controlled because she had older children in the house who would help supervise him. At

---

[3]This thorough report would have been impossible without Ms. Cahill's work.

night, he would have difficulty sleeping and she would have to lay with him and pull him close in order for him to fall asleep. He would sleep for an hour or so and then get frightened and need to look for her. At times he would have bad nightmares and she always assumed it was related to the time he spent with his mother.

As Xavier got older, his distractibility and emotional control continued to get worse. Teachers expressed their concerned that he might have Attention Deficit Hyperactivity Disorder (ADHD) or Bipolar Disorder. However, he never received the benefit of a formal evaluation or treatment program. Ms. Richards would see him struggle emotionally and watched him becoming increasingly angry toward his mother when she failed to follow through on her promises to visit. At age eight, his mother took him back with her in Bushwick, Brooklyn, but that stay was short. However, when Xavier decided he needed to leave his mother, instead of returning to Ms. Richards and her husband, Xavier asked to live with his father.

### *Paternal Involvement and Influence*

By all accounts, Xavier's father, Delroy O'Neil Baronette, has had a long history of drug involvement. Born in Kingston, Jamaica to parents Patsy and Wilson Baronette, Baronette came to the United States with his family in 1977 when he was 12. He fathered 13 children, all of whom reside in the United States.

In 1991, just three months after Xavier's brother was born, Baronette was arrested for Distribution of Narcotics (cocaine) in the Eastern District of Pennsylvania. After his

conviction and while pending deportation, he returned to New York where he briefly reunited with Xavier's mother. Around the time of Xavier's birth, Baronette had begun using O'Neil as his surname to evade apprehension and deportation, which is why Xavier's last name is not Baronette.

In 2002, Xavier and Niles moved in with their father in Columbia, South Carolina. According to Niles, their father had always been a "street figure" and as children they saw firsthand all the rewards and status associated with drug dealing. Their father did not hide his drug business from his children. Xavier has vivid memories of seeing bundles of marijuana bagged in his living room before his father made routine trips to Atlanta or Miami. During their father's absence, Xavier and his brother were often left in the care of their father's friends or girlfriends.

Although Xavier describes the time he lived with his father as one of the most stable times in his life, his brother has drastically different memories. Niles recalls that they were shuffled between girlfriends and friends and he reported being molested by a number of older women. One woman forced him to perform oral sex on her and to this day he has flashbacks of that experience. Niles believes Xavier was abused as well, but either was too young to remember all the details or too scared or traumatized to talk about what happened.

According to court documents, Baronette was arrested again on drug related charges in South Carolina when Xavier was eleven years old. Deportation proceedings commenced and Baronette was formally deported from on August 5, 2005.  After their father's arrest, the

brothers stayed in South Carolina with an "uncle" for several months before returning to New York.

Xavier had limited contact with his mother upon returning to New York since no one knew where she was. On April 7, 2006, his father was arrested on the beach in Florida on after officers observed numerous suspected illegal aliens running from the beach. Approximately 46 people were detained, admitting to arriving aboard a 36 foot fishing boat. Baronette was prosecuted and sentenced to an incarceration term of 66 months. According to information maintained by the Bureau of Prisons, he was released on March 25, 2011 and deported back to Jamaica. Although he has been in sporadic contact with Xavier, he is not, and has never been, a strong source of parental support.

*Juvenile History*

Back in New York, Xavier returned to the care of Ms. Richards. After living in Brooklyn for a few short months, she relocated to Killeen, Texas, a small town bordering Ft. Hood military base and close to where one of her daughters was living. Xavier enrolled in school in Texas, but had difficulty adapting to the new environment. He ultimately chose to return to his mother and brother in Brooklyn.

In an interview with mitigation specialist Ms. Cahill, Niles stated that he now realizes what a negative influence he was on his younger brother during this time in their lives. Their mother was not adequately able to care for or supervise them, so they were left to raise themselves. Niles took to the streets, where he learned the drug trade early like his father

before him. He admitted he was "banging" and he was the one to blame for introducing his brother to the Crips. Niles explained, "Whatever I did, my brother did. He was a good kid, but I put him in very bad situations." Niles' criminal history began in his early adolescence, a pattern that continued well into adulthood. He spent time in juvenile detention and prison, and modeled a life that Xavier also fell into at a young age.

Xavier's earliest involvement with juvenile justice system came when, at age 14, he was admitted to the Department of Juvenile Justice (DJJ) on October 30, 2008 following two arrests for grand larceny. Between October 30, 2008 and January 8, 2009, Xavier was transferred to a total of six different facilities (Mandela NSD, Beach Avenue Boys, Lutheran NSD, Boystown, Dean Street, and Barbara Blum NSD). Counselors noted in the records that, over time, they saw a radical change in his behavior. He became hyperactive, alarmed, and was, at times in a "state of panic." At the time of his discharge, it was noted that he had "mental health concerns" and needed counseling. Despite this recommendation, a treatment plan in the community was never implemented and Xavier was arrested again three months later.  Following additional charges of grand larceny, he reentered DJJ custody on April 24, 2009 at age 15.

Xavier was placed in Bergen NSD, then Barbara Blum NSD, and eventually sent to Crossroads on May 13, 2009. Approximately one month later, on June 9, 2009, he was officially sentenced and transferred to Lincoln Hall in Sommers, New York. At the time of admission, Xavier was diagnosed with a learning disability and found to be reading at the

third-grade level despite last being in the eighth grade at Midwood Middle School. While at Lincoln Hall, he was taken to Westchester Medical Center following a fight during which he was attacked by another resident and punched in the jaw. Although they found no evidence of a jaw fracture, x-rays revealed an old orbital blow out fracture that had never been treated.

After four months at Lincoln Hall, Xavier was transferred to the Pyramid Reception Center and subsequently admitted to Louis Gossett Jr. Residential Center on October 1, 2009. He remained at Gossett for the remainder of his sentence. Xavier described his time at Gossett as extremely difficult. Fights amongst residents were common and staff were known to resort to extreme measures of physical restraint. According to an *Ithaca Journal* article published in 2006, guards at Gossett were investigated for physical abuse against the residents.[4] Dwayne Robinson, who worked at Gossett from 1993 until 2004 reported that he witnessed everything from intentional rug burns, which caused severe abrasions on a resident's face by rubbing it against the acrylic carpet, to a teenager with a broken arm and concussion going without medical treatment for two days.[5] Robert Veney, a former Youth Development Aide, or YDA, at Gossett remembered being responsible for the legs of a resident about to be restrained. Rather than take the youth down using the standard procedure, which forces the resident to bend at the knees, the other guard grabbed the boy,

---

[4] Daley, J. (2006). Gossett Center accused by ex-workers of abuses Lifton request triggers Inspector General's office probe. *The Ithaca Journal*.
[5] Ibid.

picked him up and "slammed the kid to the floor so hard it broke his arm in two places," according to Veney. The boy was also knocked unconscious.[6]

In December 2007, the New York State Office of Children and Family Services (OCFS) documented 108 restraints at Tryon Boys, 14 at Gossett (now Finger Lakes), 41 at Highland, 49 at Industry, 37 at Lansing, 4 at Pyramid, 2 at Taberg, 22 at Tryon Girls and 11 at YLA. 58. In February 2008, OCFS documented 71 restraints at Tryon Boys, 25 at Gossett (now Finger Lakes), 58 at Highland, 38 at Industry, 46 at Lansing, 54 at Tryon Girls, and 14 at YLA. 59. In one week of July 2008 alone, the Lansing facility documented 40 restraints and Gossett documented 24.[7]  According to a letter dated August 14, 2009 from the U.S. Department of Justice to New York Governor Paterson regarding their investigation of the Lansing Residential Center, Louis Gossett, Jr. Residential Center, Tryon Residential Center, and Tryon Girls Center, conditions at these facilities violateed constitutional standards in the areas of protection from harm and mental health care. Specifically they found that staff used excessive force to control youths' behavior.[8] Staff at Gossett had been trained to initiate the same response in any given situation regardless of the level of the youth's resistance to following directions. Further, the practices that staff used tended to escalate, rather than de-escalate, minor behavior problems into serious incidents. Concerning the facility's mental health care, it was found that: 1) inadequate behavioral management led to an over-reliance

---

[6] Ibid.
[7] Source: http://www.legal-aid.org/media/124462/complaint_in_ocfs_lawsuit.pdf
[8] Findings letter regarding four New York juvenile facilities dated August 14, 2009 from the Department of Justice Civil Rights Division to Governor David Patterson.

on restraints and other forms of punishment to control youths' behaviors; 2) evaluation and diagnoses were inadequate; 3) the facility followed poor medication administration; 4) treatment planning was inadequate; and 5) substance abuse treatment was insufficient.

One month prior to Xavier's release from Gossett, Ms. Richards placed a request for an interstate compact so that Xavier could be released into her care in Texas. That request was ultimately denied after they were unable to reach Ms. Richards by phone. Consequently, Xavier was released back to his mother's care with no treatment or reentry plan in place. Not surprisingly, Xavier was arrested a short time later, beginning his "adult" involvement in the criminal justice system.

### *"Adult" Criminal History Overview*

Xavier was arrested twice at age of 16 on December 23, 2010 and April 21, 2011 on charges of grand larceny in the fourth degree. He was sentenced as a Youthful Offender to four months custody in the adolescent unit at Rikers Island, followed by five years probation. He reported spending one month of the time at Rikers in solitary confinement. He returned to Rikers on June 21, 2012 following an arrest and subsequent conviction for attempted robbery. His probation was revoked and he was sentenced to a year of local time with credit for the four months already served.

Xavier has reported an extremely difficult time at Rikers. He spent close to eight months in solitary confinement He experienced multiple uses of force against him by

correctional officers.  He was repeatedly sprayed with OC (pepper spray) and had his ankle

broken. He was also placed on suicide watch after he threatened to kill himself.

Xavier's account of his time at Rikers is consistent with what has been learned about

the institution. On August 4, 2014, the U.S. Department of Justice (DOJ) issued a report

detailing the findings of the investigation by the United States Attorney's Office for the

Southern District of New York into the treatment of adolescent male inmates, between the

ages of 16 and 18, at New York City Department of Correction jails on Rikers Island. Their

report primarily focused on practices and conduct during the period 2011 through the end of

2013, a time frame during which Xavier was incarcerated there.  The report concluded that

there was a pattern and practice of conduct at Rikers that violated the constitutional rights

of adolescent inmates. In particular, it was found that adolescent inmates at Rikers were not

adequately protected from harm, including serious physical harm from the rampant use of

unnecessary and excessive force by DOC staff. In addition, adolescent inmates were not

adequately protected from violence inflicted by other inmates, including inmate-on-inmate

fights. In sum, it was found that "a deep-seated culture of violence is pervasive throughout

the adolescent facilities at Rikers, and DOC staff routinely utilizes force, not as a last resort,

but instead as a means to control the adolescent population and punish disorderly or

disrespectful behavior." Rikers staff too often resorted to abusive physical force when

confronted with verbal taunts and insults, noncompliant inmates and complaints, even though

no safety or security threat existed. Although an inmate's conduct may have constituted a rule

violation and warrant some form of disciplinary action, the report pointed out that such behavior should not provoke an abusive physical response. Correction officers attempted to justify use of force by yelling "stop resisting" even when the adolescent had been completely subdued or never resisted at all. The investigation further revealed that in 2013, there were 565 reported staff use-of-force incidents involving adolescents at Rikers. It was noted that this was an "extraordinary" figure considering that the average daily adolescent population at Rikers was only 682 in 2013.

Again without the benefit of a solid reentry plan, Xavier was released from Rikers and had little family in New York to turn to for support. His brother had been arrested and his mother had relapsed into crack addition. Not surprisingly, Xavier returned to jail shortly after his release from Rikers following an arrest on Long Island for possession of a forged instrument on May 6, 2013. He remained at Nassau County Jail until he was sentenced to a two to four-year term on May 16, 2014. He was released from state prison on March 20, 2015 and arrested on the instant offense just three months later on June 25, 2015.

B.      The Guideline Calculation

*Enhancements for "Physical Restraint"*

The probation report guideline calculation for robberies 2, 4 and 5 includes two-level upward adjustments for "physical restraint" citing USSG §2B3.1(b)(4)(B).  It is submitted that the conduct to which the report refers does not meet this Circuit's standard for applying this specific offense characteristic.  In *United States v. Anglin*, 169 F.3d 154 (1999), the

Second Circuit held that pointing a gun at victims and telling them to get down and don't move does not qualify as physical restraint under the guideline. The Court noted that the examples in the application note to the guideline each involved restraint of movement by using some artifact with the victim "tied" or "bound," or the use of a space where the victim is "locked up." To extend the enhancement beyond that to, as in this case, "pushing the store employee into an inventory room" or "forc[ing] the two employees into the back of the store" would render virtually every robbery subject to a two-level enhancement.

### Enhancements for possessing a dangerous weapon

The probation report again seeks to extend the guideline, USSG §2B3.1(b)(2)(E), beyond its plain meaning, once again in robberies 2, 4 and 5. The guideline itself provides for a three-level increase "if a dangerous weapon is brandished or possessed." In the application notes, the guideline is extended to circumstances when a defendant uses an "*object* in a manner that created the impression that the *object* was an instrument was capable of inflicting death or serious bodily injury." (Emphasis added). Thus, the Second Circuit has held that the enhancement would apply to an inoperable antique pistol. *See United States v. Kirvan*, 86 F.3d 309 (2d Cir. 1996). Here, however, the report seeks to expand the enhancement to a circumstance where the victim's reported that Xavier "kept one hand near his waistband as if he had a firearm." No weapon was actually possessed, no "object" was displayed as if it were a weapon and no claim that a weapon was possessed has been made.

The Second Circuit has never extended the guideline that far and to interpret the application note to do so is in direct conflict with the precise wording of the guideline itself.

*Adjustment for obstruction of justice*

In ¶33, the report applies an adjustment for obstruction of justice because Xavier was a passenger in a vehicle which crashed while fleeing the scene of robbery 6.  Initially, the PSR described Xavier as the driver of the fleeing vehicle. The addendum to the presentence report acknowledges that, as defense counsel pointed out, Xavier was a passenger in the vehicle and remained with the vehicle at the scene, while the driver fled on foot. Nevertheless, the report articulates a new justification for the adjustment by declaring that the crash was "reasonably forseeable."  However, the Second Circuit has held that relying on "reasonable forseeability" that a co-defendant would endanger others to support a USSG §3C1.2 enhancement is reversible error.  *See United States v. McCrimon*, 788 F.3d 75 (2d Cir. 2015).

*Recalculation*

A recalculation after the elimination of the erroneous enhancements would result in the following multiple count adjustment chart:

| Group# | Adjusted Offense Levels | Units |
|---|---|---|
| Robbery 2 | 20 | 1.0 |
| Robbery 4 | 21 | 1.0 |
| Robbery 5 | 21 | 1.0 |
| Robbery 6 | 20 | 1.0 |

The greater of the adjusted offense levels is 21 and with a 4-unit increase, the combined offense level is 25.  With acceptance of responsibility adjustments, the total offense level is 22.

C.    Criminal History Level

The PSR attributes six criminal history points to two youthful offender adjudications when Xavier was 16.  While the current Guidelines themselves call for this result, it is submitted that including offenses committed before 18 to enhance an adult criminal history utterly defeats the purpose of juvenile adjudications.  There are a wide variety of reasons that juvenile adjudications are treated differently and remain confidential.  Most have to do with the reasoning that the United States Supreme Court used when overturning mandatory life sentences for juveniles who commit non-homicide offenses in *Graham v. Florida*.  As the Court noted in *Graham*:

> As compared to adults, juveniles have a "'lack of maturity and an underdeveloped sense of responsibility'"; they "are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure"; and their characters are "not as well formed."

560 U.S. 48, 68  (2010)*, citing Roper v. Simmons,* 543 U.S. 551, 569-570 (2005).  *See also,* Redding, R., *Using Juvenile Adjudications for Sentence Enhancement Under the Federal Sentencing Guidelines: Is It Sound Policy*?, 10:2 Va. J. Soc. Pol'y & L. 231 (2002).

The United States Sentencing Commission has proposed an amendment to the guidelines reflecting the need to treat youthful offenders differently. The proposed

amendment is a result of the Commission's study of the treatment of youthful offenders under the guideline.[9]

The proposed amendment is to §4A1.2(d) to exclude juvenile sentences from being considered in the calculation of the defendant's criminal history score. It also amends the Commentary to §4A1.3 (Departures Based on Inadequacy of Criminal History Category (Policy Statement)) to provide an example of an instance in which a downward departure from the defendant's criminal history may be warranted. Specifically, the proposed amendment provides that a downward departure may be warranted if the defendant had an adult conviction for an offense committed prior to age eighteen counted in the criminal history score that would have been classified as a juvenile adjudication (and therefore not counted) if the laws of the jurisdiction in which the defendant was convicted did not categorically consider offenders below the age of eighteen years as "adults."

Although this amendment has not yet been enacted the Sentencing Commission's rationale for this amendment is based on strong evidence and is emblematic of future trends. According to the 2016 Report issued by the Commission's Tribal Issues Advisory Group, there are several factors sentencing courts should consider in determining a sentence for youthful offenders. First, adolescence is a period of transition psychosocially and cognitively. Adolescents are different from adults with respect to several aspects of brain and

---

[9] See United States Sentencing Commission, "Notice of Final Priorities," 81 FR 5280004 (Aug. 24, 2016). This policy priority stemmed from recommendations about the treatment of youthful offenders contained in the May 2016 Report issued by the Commission's Tribal Issues Advisory Group and Report of the Tribal Issues Advisory Group (May 16, 2016), at http://www.ussc.gov/research/research-publications/report-tribal-issues-advisory-group.

psychosocial development. Many studies have shown that brain maturation continues well into young adulthood. Although individuals, on average, perform at adult levels on tests of basic cognitive ability by the time they are 16, most do not attain adult-like levels of social and emotional maturity until very late in adolescence or early in adulthood. Of particular relevance to psychosocial development, a youth is more susceptible to peer influence, less oriented to the future, more sensitive to short-term rewards and more impulsive than when an adult.[10]

Furthermore, just because a juvenile, like Xavier, has previously been sentenced to incarceration where some degree of rehabilitation is expected, the Report noted, "[s]anctions and punishment—such as detention or imprisonment, placement in juvenile facilities, or placement in halfway houses—may expose juveniles and youthful offenders to other anti-social peers and thus may increase their risk to reoffend. This is especially true for youthful offenders who are either low-risk offenders or not cognitively and psychosocially developed. In addition to exposing them to anti-social peers, these sentences or placements disrupt already established pro-social behaviors, activities, or relationships such as jobs, school, parenting, or religious and cultural observances, and can also increase the risk of reoffending."[11]

---

[10] 39 See, e.g., Laurence Steinberg, Adolescent Development and Juvenile Justice, Ann. Rev. of Clinical Psychol. (2009).
[11] Roger K. Warren, Evidence-Based Practice to Reduce Recidivism: Implications for State Judiciaries, U.S. Dep't of Justice, Nat'l Inst. of Corrs. 21 (Aug. 2007) (quoting Christopher T. Lowenkamp & Edward J. Latessa, Understanding the Risk Principle: How and Why Correctional Interventions Can Harm Low-Risk Offenders, Nat'l Inst. of Corrs. Ann. Issue (2004)).

Adolescents are more likely than children or adults to engage in risky behavior—a category that includes, but is by no means limited to, involvement in crime. Behavioral studies looking at the components of this behavior point out that teens are typically more impulsive than adults and more inclined to seek out novel and exciting experiences, especially in the presence of peers. Adolescents are less likely than adults to consider the future consequences of their acts, or to weigh the potential costs as heavily as the anticipated rewards.[12]

Based on the above arguments, it is submitted that there is a strong basis for determining that the Criminal History Level of VI overstates Xavier's criminal history and that this Court should consider a sentence at the criminal history level of the plea agreement that does not take into account the Youthful Offender adjudications.[13]

---

[12] BJ Casey, Richard J. Bonnie, BJ Casey, Andre Davis, David L. Faigman, Morris B. Hoffman, Owen D. Jones, Read Montague, Stephen J. Morse, Marcus E. Raichle, Jennifer A. Richeson, Elizabeth S. Scott, Laurence Steinberg, Kim Taylor-Thompson, Anthony Wagner, How Should Justice Policy Treat Young Offenders?: A Knowledge Brief of the MacArthur Foundation Research Network on Law and Neuroscience (2017).

[13] In further support of a reduced criminal history, it is submitted that paragraphs 69, 70, 73-75 must be amended since the report treats the sentences imposed on the two charges as being more than a year and therefore warranting These sentences ran concurrently. The original sentences, meted out in July, 2011 were concurrent terms of 4 months as a condition of 5 years probation. When Mr. Oneal' probation was revoked, the sentences imposed were 1 year on each charge with credit for the 4 months already served in custody, again concurrent. He was obviously released from custody when he was arrested in May 2013. Consequently, we believe that each sentence is not more than a year and should receive 2 points instead of 3.

In its response, the addendum treats the objection as if the argument was that the concurrent sentences should be treated as a single sentence. Had that been the point raised in our objection, we would have been seeking a total point level of 3 assuming that the sentences were more than a year. This is not the objection. Rather, the objection addresses the fact that each sentence imposed was one year since Mr. O'Neil was credited with the initial four months he served as part of the original sentence. The report's conclusion that each sentence warrants 3 points disregards that fact and treats the sentences as if they were each more than a year.

Finally, this Court has the discretion to apply the 2017 proposed amendment to USSG §4A1.2(k) which provides that revocations are not to be counted when calculating criminal history points.

D.     Other Objections to the PSR

As the presentence report notes the incidents listed in paragraphs 78 and 79 are the same offense and should not be listed twice. Rather, we suggest the offense be listed once with a notation that it appears twice in the NCIC database. Since the section of the report is called "Other Arrests" and this was not another arrest but merely a duplicate entry, there is no reason to include it in a separate numbered paragraph as though it were a separate arrest. Listing it twice is misleading.

Paragraphs 80 to 87 and 88 to 92 are likewise misleading since these are not separate "other arrests." The first group are obviously the cases which were ultimately combined to become the conviction listed in paragraph 70.  The second set are the state charges which became the precise crimes to which Xavier pled guilty in this case. Again, it is extremely misleading and leads the reader to count each offense twice, even though they are not included in the criminal history calculation.  Those paragraphs should be deleted.

We requested that these changes be made to the report and the Probation Department takes no position.  We request that the Court order that the report be amended to eliminate these duplications.

E.     Xavier O'Neil's Case Warrants a Variance from the Guideline Sentence Pursuant to 3553(a) Factors.

Xavier O'Neil is a 23-year-old man who has been incarcerated for the instant offense for the last 27 months. On September 9, 2016, pursuant to a plea agreement, he pled guilty to Count One of a seven-count Superseding Indictment, which charged him with Hobbs Act

robbery conspiracy in violation of Title 18, United States Code, Section 1951(a) between April 15, 2015, and December 8, 2015.

Although, Xavier has a history of arrests in late adolescence and early adulthood, this involvement should be viewed in the context of his traumatic early life history. Xavier's mother, his primary caregiver for the first five years of his life, was addicted to crack cocaine and abandoned her children for long periods of time. Despite a short respite with his godmother, Xavier was thrust into the criminogenic world of his biological father and influenced by an older brother deeply entrenched in the street lifestyle. He also lived in areas of high crime and poverty where criminal behavior was countenanced. Furthermore, as his juvenile detention records confirm, Xavier is learning impaired. Where other juveniles might be able to learn from their mistakes, Xavier struggled to adapt and conform. As noted by the Second Circuit in *United States v. Rivera*, 192 F.3d 81, 84 (2d Cir. 1999), "it seems beyond question that abuse suffered during childhood – at some level of severity – can impair a person's mental and emotional conditions."

Instead of being placed in a supportive therapeutic environment at the first sign of trouble, Xavier was placed in juvenile detention and subjected to a system fraught with inadequate behavioral management and a severe and pervasive lack of treatment and rehabilitation programs. His mental health needs, stemming from years of early trauma and cognitive impairment, were neither assessed or addressed. As he aged out of the juvenile justice system, his involvements in the criminal justice system led him to Rikers Island

during a time when "a deep-seated culture of violence" was pervasive throughout the facilities where he was held.

What is clear given Xavier's age, history and experiences is that his treatment and rehabilitation needs far outweigh the need for punitive measures. All of Xavier's documented mental health history – irritability, hyperactivity, suicidality, states of panic, trouble sleeping, problems adapting to new environments – are associated with trauma. Recent research has shown that that children diagnosed with ADHD also experienced markedly higher levels of poverty, divorce, violence, and family substance abuse. Those who have endured four or more adverse childhood events were three times more likely to use ADHD medication.

A note about the sentencing goal of deterrence.  Studies show that, regardless of the type of crime, there is no relationship between sentence length and general or specific deterrence.[14]  Justice Anthony Kennedy recently observed that long sentences, among other things, are "an ongoing injustice of great proportions," and that "long sentences have appalling effects on people's lives,"[15] a sentiment echoed in *United States v. Bannister* 786 F.Supp.2d 617 (E.D.N.Y.,2011) (Weinstein, J)

---

[14] *See* Andrew von Hirsch *et al.*, *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999); Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A review of Research 28–29 (2006); David Weisburd *et al.*, *Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes*, 33 Criminology 587 (1995); Donald P. Green & Daniel Winik, *Using Random Judge Assignments to Estimate the Effects of Incarceration and Probation on Recidivism among Drug Offenders*, 48 Criminology 357 (2010) (all concluding there is no correlation between sentence length and crime rates).

[15] (public conversation with Harvard Law School Dean Martha Minow, reported in the *Harvard Gazette* of October 22, 2015), found at http://news.harvard.edu/gazette/story/2015/10/kennedy-assails-prison-shortcomings/

RUHNKE & BARRETT
ATTORNEYS AT LAW

HONORABLE LASHANN DEARCY HALL, U.S.D.J.
October 5, 2017
Page 23

Xavier's godmother and her husband still remain supportive despite Xavier's most recent conviction and are willing to take him in upon his release. They feel a life away from New York and away from the negative influences of his youth would be in Xavier's best interest. Xavier has expressed a willingness to return to Ms. Richard's care because, she more than anyone else, provided him with unconditional love and support. It is respectfully recommended that he receive a sentence that will make that arrangement happen as soon as possible.

Respectfully submitted,

*Jean D. Barrett*
Jean D. Barrett

C:\CASE FILES\SENTENCES\Oneal\Sentence\Sentencing memo.wpd